IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOE C. WASHINGTON | } | |
| Plaintiff, | } | |
| v. | } | Case No. 16-cv-2100-CM |
| | } | |
| JARED HENRY, et al | } | |
| Defendants. | } | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Plaintiff Joe C. Washington (hereinafter "Washington"), by and through his attorney of record, and for his response to defendants' motion for summary judgment moves the court to deny same.  In support, Washington shows the court that defendants are not entitled to judgment as a matter of law; and there exist disputed genuine issues of material facts.

### MEMORANDUM IN SUPPORT OF WASHINGTON'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In support of Washington's response to defendants' motion for summary judgment, Washington shows the court the following:

### WASHINGTON'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS

1. Statement in paragraphs 1 – 19 are generally uncontroverted.

2. Statement in paragraph 20 is controverted. When defendant Henry started to drag Washington out of his car, defendant Henry did not see anything in Washington's right hand that he was initially concerned about that Washington was allegedly reaching for on his car's floor board. (Exhibit 2 - Henry interview bate 000222 lines 464-465).

3. Statement in pagraph 21 is uncontroverted in part and controverted in part. When defendant Henry snatched Washington out of his car Washington did not resist or struggle with Henry.

(Doc # 38-2 Washington depo, p. 46 lines 1-11). While on the ground, Washington remembered defendants yelling, give me your hands; it was the left hand they wanted; but Washington was unable to give his left hand because defendants were sitting on Washington's back. (Doc # 38-2 Washington depo, p. 50 lines 2-11; p. 63 lines 12-23). At no time during his arrest on August 7, 2014 did Washington attempted to touch or take Henry's gun and/or Henry's taser. (Doc # 38-2 Washington depo, p. 61 lines 1-20). Washington never owned a gun, he is scared of guns and he doesn't even know how to handle a gun. (Exhibit 1 - Washington interview bate 000355, lines 783-788).

4. Statement in paragraph 22 -36 are generally uncontroverted.

5. Statement in paragraph 37 - 38 is generally uncontroverted. But, Washington objects to exhibits and statements in paragraphs 37 and 38 in that the exhibits are not certified copy of the proceedings in the state court and lack authenticity; and on hearsay grounds. Moreover, the allegations are irrelevant to excessive force issues raised in this matter. Hence, the statement and exhibit in support of paragraphs 37 and 38 should not be considered.

## <u>WASHINGTON'S STATEMENT OF UNCONTROVERTED FACTS</u>

1. It was absolutely pretty quiet on that particular evening on August 7, 2014. There wasn't a lot of traffic out that night. The only car defendants Henry and Moore observed on the street was Washington's car when defendants spotted it travel south on Green through Mossman. So, defendants Henry and Moore decided to go after it to see what it looked like. (Exhibit 2 - Henry interview bate 000214 lines 127-135; and Exhibit 3 - Excerpt Moore interview bate 000275 lines 150-151).

2. Initially Washington did not know defendants were after him. All he saw was some lights behind him because he did not hear no siren sounds; so he just went home. (Doc # 38-2 Washington depo, p. 90 lines 21-25; and p. 91 lines 1-12).

3.  Washington had already backed his car into his driveway and stopped when defendant Henry was running toward Washington and holler at him to stop. (Doc # 38-2 Washington depo, p. 42 lines 6-12).

4.  When defendant Henry snatched Washington out of his car and to the ground face down on his stomach, Washington's left hand was pinned underneath his body; and Washington's head was facing toward his car; Henry was on Washington's back; and Henry beat the crap out Washington. (Doc # 38-2 Washington depo, p. 46, 47, 48, 49; 50 lines 1-11; p. 52 lines 1-8; and Exhibit 1 – Washington interview bate page 347 lines 414-450).

5.  The next thing Washington felt was electrical shock through his body from several taser probes deployed by Henry in quick successions into Washington's back. (Doc # 38-2 Washington depo, p. 50 lines 8-24; and p. 64 lines 3-24).

6.  While Washington was on the ground, and the defendants were beating up on him and Henry tasing him; Washington kept asking what he did wrong; but defendants never told Washington he was under arrest; or why they were arresting him. (Exhibit 1 – Washington interview bate page 347 lines 414-450; Exhibit 2 – Henry interview bate p. 225 lines 586-591; p. 226 lines 647-653; and p. 227 lns 673-702).

7.  Further, Washington remembered that after he had been handcuffed and while still on the ground, Henry delivered at least one more hard closed fists punch to Washington's head and face area. (Doc # 38-2 Washington depo, p. 59 lines 1-6).

8.  Washington estimated it took about 45 seconds at the most from the time defendant Henry opened his car door and snatched him out of his car to the time he was placed in handcuffs and in custody. It happened very quickly. (Exhibit 1 - Washington interview bate 000362 lines 1094–1123). Defendant Moore estimated the alleged resisting and taking Washington in handcuffs took about a minute. (Exhibit 3 - Moore interview bate 000283 lines 516-526).

9. Washington was not on any kinds of drugs - prescribed or illegal – when he was arrested on August 7, 2014. (Doc # 38-2 Washington depo, p. 21 lines 10-12; p. 91 line 25; and p.92 lines 1-25; and Exhibit 1 – Washington interview bate page 378 lines 1823-1833).

10. Washington was given breathalyzer tests after he was placed in custody at the scene and at the jail. The breathalyzer result at the scene was .017; and the result for the breathalyzer test at the jail was 0.00; which tests confirmed Washington was not under the influence of alcohol when he was arrested on August 7, 2014. (Exhibit 4 – Breathalyzer report bate page 000033; and Exhibit 14 – Sutton interview bate page 320 lines 94-97; and p. 329 lines 502-536).

11. Washington's blood test shows a Negative result for any illegal drugs use in his body when he was arrested on August 7, 2014. (Exhibit 5 - Regional Forensic Science Center Toxicology Laboratory Report bate page 5208).

12. Washington spent three and a half days in the jail clinic for medical observation and treatment. Initially the jail medical staff started out treating Washington with just Gatorade, but they later had to put him on IV drips.  (Exhibit 1 - Washington interview bate 000354 lines 734-765; and p. 355 lines 766-770; Exhibit 6 - Excerpt Washington jail medical record).

13. There was no audio/video recording of Washington's arrest because the 284 SCAT patrol car vehicle # 00261, 2010 Ford Crown Victoria defendant Henry and Moore were riding on August 7, 2014 was not equipped with audio/video devices; and defendants were not wearing Axon camera. (Exhibit 8 – Excerpt Oblinger interview bate 000314 lines 630-641).

14. The attached photographs accurately depicts some of the taser probes that the defendant Henry deployed; and that were embedded in Washington's back and visible punctured holes and burn marks on Washington's back; and red blood in Washington's eyes on August 7, 2014. (Exhibit 7 -photographs bate 107, 117, 118, 119, 120, 122, 133, and 137).

15. Washington pled guilty to lesser offense charges because he has been sitting in jail for four months. He got tired of sitting in jail "on these, you know, frivolous charges." Washington decided he wanted to get out of jail, so he "pleaded for less charges just to be able to get out. It was nothing I was guilty of. That was just what I did to get out." (Doc # 38-2 Washington depo, p. 87 lines 20-25; p. 88 lines 1-19; and Exhibit 1 – Washington interview bate 339 lines 60-64).

16. Washington felt intense pain and electric shocks from the taser probes and drive-stun, the punches and taser was traumatic, Washington war hurt, and he is worried it will be more difficult for him to get a job; and Washington was bordered for been tased for a simple traffic infractions. (Doc # 38-2 Washington depo, p. 50 lines 8-24; and Exhibit 1 – Washington interview bate  000365 lines 1221-1227; p. 372 lines 1555-1571; p. 373 lines 1575-1598; bate 000383 lines 2047-2063; and p. 384 lines 2067-2076).

17. The Wichita Police Department found Henry used excessive force when he tased a suspect who was riding a bicycle in a 2009 incident. (Exhibit 9 - Administrative Internal Investigation Conclusion, bate page 3508-3510).


### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. In making that determination, a court must view the evidence in the light most favorable to the opposing party. *Tolan v. Cotton*, 572 U.S. _____, 134 S.Ct.1861, 1866, 188 L.Ed.2d 895 (2014); *Gol TV, Inc. v. EchoStar Satellite Corp.*, 692 F.3d 1052, 1055 (10th Cir. 2012); *Larry Snyder & Co. v. Miller*, 648 F.3d 1156, 1159 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

Material factual disputes cannot be resolved at summary judgment based on conflicting affidavits or evidence. To come within the protection of this rule, however, the nonmovant's affidavits

must be based upon personal knowledge and set forth facts that would be admissible in evidence. Only material factual disputes preclude summary judgment; factual disputes about immaterial items are irrelevant. Affidavits or other evidence offered by a nonmovant must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmovant. *Id.* at 249-50, 106 S.Ct. at 2510-11. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 289, 88 S. Ct. 1571, 1592-93, 20 L.Ed.2d 569 (1968)).

In articulating the factual context of the case, the district court must adhere to the axiom that in ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Andersonv. Liberty Lobby, Inc*, 477 U.S. 242, 255, 106 S.Ct 2505, 91 L.Ed.2d 202 (1986).

### **ARGUMENTS AND AUTHORITIES**

I.  **Defendant Henry acting under color of state law used unreasonable and excessive force in arresting Washington in violation of his Fourth Amendment rights**.

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The inquiry into whether this right was violated requires a balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1866 L.Ed.2d 1 (1985); see Graham, supra, at 396, 109 S.Ct. 1865.

The United States Supreme court and the Tenth Circuit have held that lower courts must evaluate excessive force claims under the Fourth Amendment's objective reasonableness standard, which is judged from the perspective of a reasonable officer on the scene. To determine if an officer's actions were objectively reasonable, courts carefully consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010); *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012).

An "assessment of the degree of force actually used is critical to the question of whether the force was excessive." *Grauerholz v. Adcock*, 51 Fed. Appx. 298, 300 (10th Cir. 2002) (unpublished) (citing *Tennessee v. Garner*, 471 U.S.1, 8-9 (1985). This balances the "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, #07-751, 555 U.S. 223, 231 (2009).

In the case at hand, the court must find that the first *Graham* factor, that is, the severity of crime, weighted heavily against the defendants because the defendants used more than minimal force given the alleged petty traffic infraction – a failure to signal a turn - defendants claimed Washington committed.  The record is undisputed that Washington was initially been stopped for a minor traffic infraction of failure to use a turn signal. In Kansas, failure to signal a turn appears to be only directive rather than punitive. Nevertheless, the offense of failure to signal a turn is so minimal that no specific punishment was provided in the statute. See, *K.S.A.* 8-1548.

Further, the record is not so clear whether Washington may have committed a misdemeanor offense of failure to bring his vehicle to a stop after he realized the police patrol car actions may have

been directed against him.  Even if we assume for the sake of argument that Washington committed a traffic infraction of a failure to bring his vehicle to a stop. In Kansas, a first conviction for fleeing or attempting to elude a police officer is a class B nonperson misdemeanor under K.S.A. 8-1568. Clearly, at the point Washington parked his car in his driveway he may have at worst committed two petty minor traffic or misdemeanor offenses. Hence, this fact weighs heavily against the use of significant force to arrest him. See, *Fisher v. City of Las Cruces*, 584 F.3d 888, 895 (10th Cir. 2009) (noting that detainee's commission of a petty misdemeanor weighed in favor of using minimal, if any, force).

In this case, however, the record is undisputed that defendants used heightened intermediate force that is clearly not proportional to the alleged traffic infractions or misdemeanor offenses Washington may have committed. The record is undisputed that defendant Henry punched and tased Washington numerous times during the arrest. Further, the undisputed record shows the defendant never told Washington he was been arrested for any offense when he snatched him out of his car and to the ground. Furthermore, the undisputed record shows defendant Henry did not warn Washington before he tased Washington in both dart probes and drive-stun modes. (Exhibit 1 – Washington interview bate 000353 lines 688-690; and Exhibit 2 – Henry interview bate page 222 lines 485-489).

In addition, the record is clear and undisputed that defendant Moore agreed with the level of force Henry's used; and Moore raised no objections to the level of force Henry employed. (Exhibit 3 – Moore interview bate page 293 lines 946-960). The record further shows that Henry tased Washington while defendant Henry and Moore were sitting on top of Washington's back. The defendant also punched Washington several times during the alleged struggle; and at least one more time after Washington had been handcuffed and in custody. (Doc # 38-2 Washington depo, p. 46, 47, 48, 49; 50 lines 1-25; p. 51 lines 1-5; p. 52 lines 1-8; and p. 64 lines 3-24).

There is no doubt that repeated use of the taser and several closed fist punches exceeded the minimal force that would be proportional to Washington's crime. Thus, Washington submits that the first *Graham* factor weighed against the defendants.

The second *Graham* factor, whether Washington posed an immediate threat to the safety of the officers or others, similarly weighed against the defendants in this case. There was no evidence that Washington was a danger to anyone, perhaps may be other than himself, when he allegedly failed to signal a turn before defendants attempted to stop him for this minor traffic infraction. According to these defendants, there was no traffic on the street; it was a very quiet night. Washington's car was the only car defendants saw travelling on the street when defendants decided to "check it out." To justify their apparent illegal stop of Washington's car, however, defendants claimed they observed Washington failed to signal a turn. (Exhibit 2- Henry interview bate 000214 lines 127-135; and Exhibit 3 - Excerpt Moore interview bate 000275 lines 150-166).

Likewise, there was no evidence to suggest Washington was speeding or driving recklessly when he allegedly failed to stop for defendant as he drove a short distance to his house and safely parked his car in his driveway. (Doc. # 38-3, paragraph 3; and Exhibit 2 – Henry interview bate 000217 lines 237-238; and lines 258-262; and Exhibit 3 – Moore interview bate 000282 lines 477-479). Clearly, at the point Washington parked his car in his driveway; Washington posed no threat to defendant Henry and Moore's safety requiring the use of escalated force.

The only thing that changed the dynamics of the defendants' encounter with Washington on August 7, 2014 was defendant Henry's alleged claim he saw Washington appeared to be reaching toward his car's floorboard for a weapon. Acting upon this alleged apparent false perception, defendant Henry immediately grabbed Washington by the shoulder and yanked him out of the car. Clearly, defendant Henry's alleged fear Washington was retrieving a weapon instantly vanished when defendant Henry dragged Washington out of his car. Defendant Henry conceded he did not see anything in

Washington's right hand that defendant Henry was initially concerned about. (Exhibit 2 - Henry interview bate 000222 lines 464-465). Accordingly, any use of anything more than a minimal force to arrest Washington, at this point, is objectively unreasonable.

In this case, however, the record shows that instead for defendants to deescalate the use of force; they dramatically escalated it. It is undisputed that defendant Henry delivered several knee blows and closed fists punches to Washington's ribs as defendant Henry dragged him out of the car. (Exhibit 2 – Henry interview bate 000223 lines 530-535; and bate 000224 lines 574-577). The record further shows that Washington landed face down on the ground and one of his hands was caught underneath his body. (Doc # 38-2 Washington depo, p. 46, 47, 48, 49; 50 lines 1-5; p. 51 lines 1-15; p. 52 lines 1-8; and p. 64 lines 3-24). Furthermore, the record is undisputed defendant Moore and officer Hemmert jumped on Washington's back. (Exhibit 2 – Henry interview bate 000223 lines 530-535; and bate 000224 lines 574-577). Shortly thereafter, defendant Henry without any warning, started to tase Washington in probe dart and drive-stun modes. (Doc # 38-2 Washington depo, p. 50 lines 8-24; and Exhibit 2 – Henry interview bate 000224 lines 540-545).

The quantum amount of force Henry and Moore used to arrest Washington on August 7, 2014, as the record revealed, was certainly objectively unreasonable because neither defendant Henry nor defendant Moore faced any threat to their safety immediately after defendant Henry snatched Washington out of his car empty handed; and unarmed. (Exhibit 2 - Henry interview bate 000222 lines 464-465).

The defendants' claims that Washington did not feel the pain from the violent knee blows to his ribs, several closed fists punches to his ribs, his face, and head; and that Washington did not felt shock and pain from the taser probes and drive-stuns is simply not true. Washington certainly felt shock and pain through his body; and defendant Henry even conceded Washington was squirming from the taser's electric shock and pain. (Doc # 38-2 Washington depo, p. 50 lines 8-24; and p. 64 lines 3-24; and Exhibit

2 – Henry interview bate 000226 lines 630-654; p. 227 lines 677-702). Further, the taser probes didn't simply grace Washington's body; they were solidly embedded in Washington's body. The EMS crew had to cut the back of Washington's T-shirt before they could successfully remove the taser probes from his body. (Exhibit 12 – Hemmert interview bate page 201 lines 376-377; Exhibit – 13 Lt. Pinkston interview bate page 414 lines 120-121; and Exhibit 15 – Sedgwick County EMS Prephospital  Care report).

Further, in a desperate attempt to cover up their misdeeds defendants claim Washington was on some kinds of alcohol or illegal drugs. Indeed, this claim is patently frivolous and lack merit. Nevertheless, the record shows the PBT test given Washington at the scene came back with a 0.017; and the breathalyzer test given Washington at the jail came back with a 0.00. (Exhibit 4 – Breathalyzer report page 000033; Exhibit 12 – Hemmet interview bate 000204 lines 495-521; and Exhibit 1 – Washington interview bate 000349 lines 513-526). These alcohol test results are conclusive evidence that Washington was not under the influence of alcohol. Likewise, Washington's blood test result was negative for any illegal drugs use in his body at the time of his arrest on August 7, 2014. (Exhibit 5 - Regional Forensic Science Center Toxicology Laboratory Report bate page 5308).

In a further desperate attempt to justify their use of totally unreasonable force to arrest Washington on August 7, 2014 defendant Henry claims that Washington tried to take his gun and taser. This claim is patently untrue. The record shows Moore was holding Washington's right hand while Washington's left hand was pinned underneath his body and under defendants Henry and Moore's weight who were sitting on Washington's back. And this claim is been made against Washington who doesn't like guns; and doesn't even know how to use guns. (Exhibit 1 - Washington interview bate 000355, lines 783-788). It is obvious from the record that defendant Henry's claims Washington attempted to take his gun and taser was fabricated to cover up defendants' violent physical mistreatment of Washington on August 7, 2014.

Nevertheless, applying the summary judgment rule and viewing the record in the light most favorable to Washington; and because the parties disputed the quality, quantity and the necessity of using escalated force to arrest Washington on August 7, 2014, there certainly remains disputed genuine issue of material facts for the jury to decide on the issue whether Washington posed any threat to defendants' safety as claimed. Hence, defendant Henry and Moore are not entitled to neither qualify immunity nor summary judgment as a matter of law.

The third *Graham* factor is whether Washington was actively resisting arrest or attempting to evade arrest by flight. Washington submits this factor weighed against the defendants as well.

The defendants made all kinds of claims under the sun that Washington resisted arrest after defendant Henry snatched him out of his car. They claimed Washington tackled and struggled with them mightily. Defendants even claimed that Washington tried to take defendant Henry's gun and taser; when in fact, Washington's hands were clearly unavailable for him to use to achieve such impossible physical endeavor. (Doc # 38-2 Washington depo, p. 61 lines 1-20). They further claimed that Henry kneeing Washington in his ribs several times, delivering heavy closed fists punches to Washington's ribs, head, and face were ineffective. Furthermore, defendants claimed taser probes weapon that sends up to 50,000 volts of electricity through Washington's body; and taser in drive-stun mode[1] which impacted excruciating pain on Washington's body were also ineffective to control and place Washington's hands in handcuffs. (Exhibit 3 – Moore interview bate page 293 lines 946-960). All these failure of pain control mechanics, defendants claimed were because Washington was on some kind of illegal drugs that made his body resistance to pain.

---

[1] A Taser works in two difference ways. First, it can be fired from a distrance. In that mode, two probes with wires connected to them are fired at the person. When the probes pierce the person's skin, the electrical shock typically incapacitates the person by causing loss of muscle control or "temporary paralysis" and pain. See, e.g. Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010). Second, it can be used by placing the taser directly on the person and shocking him. This is called a "drive-stun" and it is used to get the person to comply through intense pain. "A Taser like the M26 generates a charge of 50,000 volts, although the total amount of electricity delivered, and hence the severity of the pain inflected, depends greatly on how long the Taser is applied." Casey v. City of Federal Heights, 509 F.3d 1278, 1285 (10th Cir. 2007).

On his part, Washington vehemently denied that he resisted or struggled with defendants. Further, Washington denied he attempted to take defendant Henry's gun and/or taser. (Doc # 38-2 Washington depo, p. 46 lines 1-11; p. 50 lines 2-11; p. 63 lines 12-23; and Doc # 38-2 Washington depo, p. 61 lines 1-20). Washington estimated it took about 45 seconds at the most from the time defendant Henry opened his car door and snatched him out of his car to the time he was placed in handcuffs and in custody. (Exhibit 1 - Washington interview bate 000362 lines 1094–1123). Defendant Moore estimated it took about one minute from the time Henry snatched Washington out of his car the time Washington was handcuffs. (Exhibit 3 - Moore interview bate 000283 lines 516-526).

Officer Hemmert who arrived at the scene shortly after defendant Henry snatched Washington out of his car stated that Washington's "right arm was available for me right when I got there," and "it goes for not very long for maybe five seconds between that point and we get his left arm and get the other handcuff on." (Exhibit 12 – Hemmert interview bate 000198 lines 230-235). Officer Hemmert observed Washington was on his stomach, and defendants were "on top of him trying to get him into custody, pull his arms behind him." (Exhibit 12 – Hemmert interview bate 000197 lines 220-224; and bate 000198 lines 225-226). Defendant Moore confirmed that when he asked Washington to give his hands and not resist, Washington "did yell at me that he wasn't resisting" arrest. (Exhibit 3 – Moore interview bate 000280 lines 399-401).

Unfortunately, no audio/video recording of the incident is available for the court's review because the patrol car defendants were riding was not equipped with audio/video devices. So, it boils down to Washington's words against defendants' allegations. Therefore, evaluating these disputed divergent stories of the events requires determination of which party to believe; a task that must be left for the jury to decide. Hence, Washington submits that a reasonable jury could find Washington was not resisting arrest given the fact that Washington's right arm was available to defendants; and his left arm was pinned underneath him while defendants were sited on his back. Thus, defendants are not entitled

to qualify immunity or summary judgment as a matter of law because there remain disputed genuine

issues of material fact as to whether Washington was resisting arrest or trying to escape arrest.

Further, Washington submits that under the circumstances presented in the record, the claim

that Washington posed an unacceptable safety risks to defendants even upon the arrival of defendant

Moore who immediately jumped on Washington's back on the ground cannot prevail at this juncture.

Defendants Henry and Moore are physically fit, big and strong. (Exhibit 13 - Lt. Pinkston interview bate

416 lines 192-217). The court must take note of the fact that Washington, who was 59 years old; and

appears to be physically smaller than both defendant Henry and Moore; and who did not verbally

threaten defendants; and who is practically unable to physically attack defendant Henry as defendants

claimed must be seen for what it was - a fabricated story. Thus, defendants' claims that Washington was

resisting arrest lacks merit, and must be disregarded. Hence, the court must find that the third *Graham*

factor weighed against these defendants.

Furthermore, the defendants' claim that they were helpless in controlling Washington in

attempt to justify their ruthless physical attacks on Washington is without merit. It has been held that

where officers at the scene outnumbered the suspect, like here, any existing threat decreased and the

officers' options for taking Washington into custody increased. See, e.g., *Beaver v. City of Federal Way,*

*507 F. Supp. 2d 1137, 1145 (W.D. Wash. 2007)* (noting that excessive force analysis changed when

additional officer arrived so that "there were two officers to control the situation. To the extent that

[the plaintiff] posed an `immediate threat', that threat was significantly diminished when [the second

officer] arrived to provide backup. Once [the officer] had backup, his options increased dramatically.").

And given the fact in this case where defendant Henry had already dragged Washington out of the car to

the ground, defendants' claim of helplessness became clearly untenable.

Given the lack of a viable warning of arrest or tasing, along with Washington been pinned down by both defendant Henry and defendant Moore's weight sitting on his back while he was been tased, a reasonable jury could conclude that Washington was not actively resisting arrest or fleeing at that point in the encounter.

Furthermore, Washington submits that Henry's claims that Washington was trying to take his gun and his taser are nothing less than a fabricated afterthought to cover up his violent rage and application of excessive force on Washington. So was the criminal charges levied against Washington. The record is undisputed that defendant Moore admitted that he grabbed Washington's right hand and Washington's left hand was caught underneath his body. So, how is Washington going to be able to take defendant Henry's gun and taser? It makes no sense because it is a fabricated story.

In the alternative, and for the foregoing reasons, the court must finds that the defendants have not met their burden of showing that no genuine dispute of material fact exists concerning whether Washington posed an immediate threat to defendant Henry or defendant Moore's safety when Henry began to tase Washington.

Further, defendants' claims that because Washington did not suffer physical permanent injuries as a result of defendants' use of excessive force to arrest him on August 7, 2014 lack merit, and must be disregarded. It has been held that even use-of-force without injury can be "excessive" force. The mere fact that a force recipient does not sustain a significant injury does not, by itself, defeat an excessive force claim. *Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991). A jury could properly find that an officer's use of pain compliance techniques before a suspect posed any immediate threat to the arresting officers was excessive force. *Barlow v. Ground*, 943 F.2d 1132 (9th Cir, 1991).

Applying the summary judgment rules and viewing the facts in this case in the light most favorable to Washington, this court must find that the quantity of physical force defendant Henry and

Moore used to arrest Washington on August 7, 2014 as alleged by Washington amounted to unreasonable and excessive use of force, which violated Washington's Fourth Amendment rights.

WHEREFORE, Washington prays the court denies and overrules defendant's motion for summary judgment because Washington's allegations viewed in the light most favorable to him shows that defendant violated his Fourth Amendment rights. In the alternative, because the record is clear that the first *Graham* factor is undisputed; and weighed against the defendants. Further, because the parties disputed the second and third *Graham* factors, Washington prays the court denies and overrules defendants' motion for summary judgment because defendants are not entitled to qualify immunity as a matter of law and because there remains genuine issue of material facts to be decided by the jury.

II.    <u>**The defendants' violated Washington's clearly established right when defendants used unreasonable and excessive force to arrest Washington on August 7, 2014**</u>.

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666(2002). Denial of qualified immunity is appropriate if the officer violated law that was "clearly established" at the time of his or her conduct. *See, e.g., Perez v Ellington, 412 F.3d 1128, 1131 (10ᵗʰ Cir. 2005).* The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011), quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)* (*quoting Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In other words, "an officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are `no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as [he]

did." *Casey, 509 F.3d at 1286* (quoting *Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001)*).

In the Tenth Circuit, fact that use of a Taser without giving warning before deploying it may constitute excessive force was clearly established as early as *Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007)*. See also *Mecham v. Frazier, 500 F.3d 1200 (10th Cir. 2007)* (noting that use of pepper spray to arrest uncooperative misdemeanant may constitute excessive force if not outweighed by governmental interests in use of that force.

In this case, defendant Henry's weapon of choice was a Taser, kneeing, and closed fists punches, which control tactics defendant Moore acquiesced to without objections. It has been held that a taser is "a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain." Although tasers may not constitute deadly force, their use unquestionably "seizes" the victim in an abrupt and violent manner. Accordingly, the "nature and quality" of the intrusion into the interests of the plaintiff protected by the Fourth Amendment was quite severe. See, *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010).

Prior to the incident in this case, defendants Henry and Moore were trained in the use of taser as a weapon in controlling suspects. The defendants knew it is unreasonable use of force to taser a suspect in dart or probe mode in a rapid succession without giving the suspect warning and opportunity to recover. Henry has been found to have violated department's policy for using excessive force when he tased a suspect riding a bicycle. (Exhibit 9 – Administrative Internal Investigation Conclusion, bate page 3508-3510).

Further, defendants were exposed to the decision in *Beaver v. Federal Way*, 507 F. Supp. 2d 1137 (W.D Wash. 2007) in taser use training courses they took prior to the incident in this case. The

*Beaver* court recognized that being "tased" is a painful experience. The defendants were taught in taser use training that the *Beaver* court concluded that the following issues regarding taser use are clearly established:

> "First, the use of taser involves the application of force. Second, each application of a taser involveds an additional use of force. Third, multiple applications of a taser cannot be justified solely on the grounds that a suspect fails to comply with a command, absent other indications that the suspect is about to flee or poses an immediate threat to an officer. The court found that this is particularly true when more than one officer is present to assist and control a situation. Fourth, any decision to apply multiple applications of a Taser must take into consideration whether a suspect is capable of complying with the officers' commands." (Exhibit 10 – Use of Force bate 000937-953; and Exhibit 11 – Excerpt Taser Protect Life User Certification Course Taser X26 Conducted Electrical Weapon, Version 19 Released April 2013 slide bate 0001919-1927; and p. 1930-1931).

Also, these defendants were exposed in taser use training to the holding in *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010), which ruled that additional factors the court considered was that *Brooks* was tased three (3) times over the course of less than one minute. The court held that "tasing *Brooks* in such a rapid succession allowed no time for her (pregnant woman) to recover from the pain and reconsider her refusal to comply with the officers requests." These defendants were equally exposed to the ruling in *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2010); where the court ruled that officers must give the suspect a reasonable amount of time to gather herself/himself; and must give the suspect a reasonable opportunity to consider the consequences of her/his refusal to comply with commands before each ECD application. (Exhibit 10 – Excerpt Use of Force slide bate 000898; 000937-953). Here however, despite his knowledge, defendant Henry failed to give Washington any reasonable time or opportunity to gather himself before he deployed tasers into Washington's body in rapid succession.

In addition, these defendants were trained and were aware of the United States Supreme Court ruling in *Scott v. Harris*, 550 U.S. 372, 383 (2007), which held that in judging whether officer's actions were reasonable, we must consider the risk of bodily harm that officer's actions posed to suspect in light

of the suspect's threat to the public that officer was trying to eliminate. (Exhibit 11 – Excerpt Taser

Protect Life User Certification Course Taser X26 Conducted Electrical Weapon, Version 19 Released April

2013 slide bate 001870; 0001919). In this case, there was no threat to the public or to the officers

immediately after defendant Henry snatched Washington out of his car and knocked him facedown on

the ground.

      Further, these defendants were exposed to Taser Taser Protect Life User Certification Course

Taser X26 Conducted Electrical Weapon by the Taser Training Academy prior to the incident in this

matter. The course material stated in relevant portion that taser (hereinafter "CEW"):

> "CEW in dart mode constitutes an "intermediate, significant level" of force that must be
> justified by a strong government interest. . . CEW against a non-violent misdemeanant who
> appeared to pose no immediate threat and who was given no warning was unconstitutional
> excessive force. It is an excessive and unreasonable use of force for a police officer repeatedly to
> administer electrical shocks with a CEW on an individual who no longer is armed, has been
> brought to the ground, has been restrained physically by several other officers, and no longer is
> actively resisting arrest. . . Officers using unnecessary, gratuitous, and disproportionate force to
> seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are
> not entitled to qualified immunity." (Exhibit 11 – Excerpt Taser Protect Life User Certification
> Course Taser X26 Conducted Electrical Weapon, Version 19 Released April 2013  slide bate
> 0001920-1922).

      The record in this case shows that defendants failed to yield this warning. Defendant Henry

punched and tased Washington repeatedly; knowing full well that Washington was unarmed, has been

brought to the ground, and was been restrained physically by several other officers. Clearly, defendants'

actions were unreasonable application of unnecessary and excessive force.

      Further, these defendants, prior to the incident in this matter, were exposed the CEW Probe

Mode Guidance, which states in relevant part:

> "Generally, to use CEW in probe mode officer must reasonably perceive subject to be:
> An immediate threat of harm/injury, or
> Fleeing or flight risk from serious offense crime and the officer is justified in tackling the person.
> Consider necessity of a verbal warning before deploying the CEW. . ."

(Exhibit 11 – Excerpt Taser Protect Life User Certification Course Taser X26 Conducted Electrical

Weapon, Version 19 Released April 2013 slide bate 0001923). It has been established here that

defendants didn't even tell Washington he is under arrest; and certainly defendant Henry did not warn Washington he was going to tase him. There is no doubt defendants' action violated clearly established warning law.

Furthermore, the CEW certification course, which these defendants were exposed to prior to the incident in this matter stated:

> "Clarifying the Graham Factors: (Immediate threat to safety of officers or others)
> Graham's "immediate" vs. "possible: threat:
> A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.
> - *Beaver* – "possibly" had a weapon under him
> - *Brooks* – "could" have fled in car

The taser use training course manual warned that ONLY "immediate" threats  required use of taser in either dart or drive-stun modes – NOT "possible" threats . (Exhibit 11 – Excerpt Taser Protect Life User Certification Course Taser X26 Conducted Electrical Weapon, Version 19 Released April 2013 slide bate 0001931). But, defendants failed to yield this warning and admonition. They used unreasonable and excessive force to arrest Washington on August 7, 2014. Hence, defendants' actions violated Washington's clearly established law.

Further, the record is undisputed that defendant Henry tased Washington several times during Washington's arrest on August 7, 2014 without warning; and without even letting Washington know he was under arrest for a minor misdemeanor or traffic infraction. Applying the rule that tasing a suspect without warning to the facts in this case; and defendants' training on taser use; there is no doubt that defendant Henry use of taser without warning Washington on August 7, 2014 violated clearly established law.

A.	**Defendant Moore is liable for use of excessive for in arresting Washington**.

Defendant Moore's claim he is not liable for use of excessive force is without merit and should be disregarded.  The Tenth Circuit case law clearly establishes that an officer may be personally involved in the use of excessive force even if his involvement amounted to indirect participation. Liability for "indirect participation" was established in April 2008 when the Tenth Circuit issued *Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008),* and again in December 2008 when the Tenth Circuit issued *Buck v. City of Albuquerque, 549 F.3d 1269 (10th Cir. 2008)*. "The requisite causal connection is satisfied if the [officer] set in motion a series of events that the [officer] knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights." *Buck, 549 F.3d at 1279-80*.

In Fogarty and its sister case Buck, the Tenth Circuit held that a police captain who supervised officers' response to a peaceful political demonstration was not entitled to qualified immunity when the officers' use of force was excessive under the circumstances. In Fogarty, the Tenth Circuit noted that the Graham analysis includes consideration of "whether an officer's own `reckless or deliberate conduct' in connection with the arrest contributed to the need to use the force employed." *523 F.3d at 1159-60* (citing Tenth Circuit cases from 2004 and 2001). See also *Henry v. Storey, 658 F.3d 1235, 1239 (10th Cir. 2011)* (holding that although the Graham factors guide the analysis of an excessive force claim, they are "non-exclusive").

In addition, it has been held that an officer has a duty to intervene to protect a citizen when he/she witnesses another officer using excessive force against that citizen. *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993). That duty exists whether the officer who fails or refuses to intervene is a supervisor or not. *Skeveflax v. Quigley*, 586 F. Supp. 532, 543 (N.J. 1984); Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972). A law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983." *Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996).*

21

In *Mick,* a police officer was accused of pulling the defendant out of her car, throwing her to the pavement, stepping on her, and dragging her across the ground, in violation of the Fourth Amendment. The court held that a Secret Service agent who was present could be constitutionally liable for his failure to intervene if he "watched the incident and did nothing to prevent it." *Id.* at 1137. The *Mick* court cited several cases from our Circuit and others holding that there is an affirmative constitutional duty to stop other officers from using unconstitutionally excessive force. *Id.* at 1136 (citing Lusby v. T.G. & Y. Stores, Inc., *749 F.2d 1423, 1433 (10th Cir.1984), vacated on other grounds sub nom.* City of Lawton v. Lusby, *474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985)*; O'Neill v. Krzeminski, *839 F.2d 9, 11 (2d Cir.1988)*; Fundiller v. City of Cooper City, *777 F.2d 1436, 1441-42 (11th Cir.1985)*).

Here, defendant Moore fully participated in the violation of Washington's Fourth Amendment rights to be free from applicable to unreasonable and excessive force to make arrest. Defendant Moore saw defendant Henry punched and tased Washington repeatedly in rapid secession in both dart and drive-stun modes. In addition, defendant Moore did not object to defendant Henry's use of unreasonable and excessive force. Rather, defendant Moore joined in Henry's untenable claims that Washington did not feel the pain from the force of Henry's kneeing Washington in his ribs, punching Washington in the ribs, face, and head. Defendant Moore whole heartedly joined in the claim that Washington did not feel any sock or pain when defendant Henry deployed taser in both dart and drive-stun modes into Washington's body. (Exhibit 3 - Moore interview bate 293 lines 946-960).

Based on the above facts, this court must conclude that defendant Moore was equally liable for the use of unreasonable force to arrest Washington on August 7, 2014. Hence, these defendants are not entitled to qualified immunity for their actions at summary judgment stage.

**WHEREFORE**, Washington prays the court denies and overrules defendants' motion for summary judgment because these defendants are not entitled to qualified immunity because the law

regarding use of force with respect to tasers use without warning; and the use of excessive force to make arrest in general were clearly established at the time of the incident in this case on August 7, 2014.

### CONCLUSION

Base on the above and foregoing facts and legal analysis, Washington prays the court denies and overrules defendants' motion for summary judgment because these defendants are not entitled to qualify immunity as a matter of law. This assertion is in order because Washington has conclusively established that defendants Henry and Moore violated Washington's Fourth Amendment by showing that *Graham* first factor weighed against the defendants because there is no dispute the alleged traffic infraction or misdemeanor offense that precipitated defendants' contact with Washington on August 7, 2014 was a minor traffic infraction; which calls for very minimal use or no use of force to make the arrest. In this case, however, these defendants used heightened intermediate force, including closed fists punches, tasers in dart probe and drive-stun modes.

Further, Washington has established, as explained above, that the second *Graham* factors weighed against these defendants as well because any alleged fear that Washington was reaching for a weapon, as defendant Henry claimed, quickly vanished when defendant Henry snatched Washington out of his car empty handed; and unarmed.

Furthermore, Washington has shown conclusively that the third *Graham* factor also weighed against these defendants because Washington was outnumbered by younger, agile, and physically able police officers; he was kneeled and punched in his ribs, face, and head; and he was tased in dart probe and drive-stun modes; while two to three officers were sitting on his back. All these physical violent actions were taken against Washington who was never told he was been arrested for a crime; who was not resisting arrest; who was not warned he will be tased; and who was punched in the face and head while he was in handcuffs.

In addition, Washington has conclusively shown the court that he law against use of excessive escalated force to make arrest of suspects who committed petty misdemeanor or minor traffic infraction, as Washington in this case, has been clearly established; and the law against tasing suspects without been told he was under arrest; and without warning that he will be tased before tasers were used has been clearly established in the Tenth Circuit prior to the incident in this matter on August 7, 2014.

In the alternative, if the court should find that these defendants have shown that any of the three *Graham* factors is in dispute, then Washington prays the court to deny and overrule these defendants' motion for summary judgment because there remains genuine issue of material facts for the jury to resolve.

Respectfully submitted,

/s/ Prince Adebayo Ogunmeno
Prince Adebayo Ogunmeno KS # 14808
155 South 18th Street, Suite 250
Kansas City, Kansas 66102-5654
Tel. (913) 233-2133
*aikogun@ogunmenolawfirm.com*
*Attorney for the Plaintiff.*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing document was filed electronically on this **May 10, 2017**. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the court's electronic filing system, including attorneys for the defendants Steve Pigg, at *spigg@fisherpatterson.com*, 3550 SW 5th Street, P O Box 949, Topeka, KS 66601-0949.

/s/ Prince Adebayo Ogunmeno
Prince Adebayo Ogunmeno # 14808